## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JOHN MCQUEENEY, et al., ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **Case No. 09-4015-JAR** |
| ) | |
| METROPOLITAN LIFE ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| **Defendant.** ) | |
| _____) | |

## MEMORANDUM AND ORDER

Plaintiffs John McQueeney and Douglas Guerin filed a Complaint on February 5, 2009,
claiming breach of fiduciary duty, fraud, and constructive fraud against defendant Metropolitan
Life Insurance Company ("Met Life").[1]  Defendant filed a motion to dismiss under Fed. R. Civ.
P. 9(b), for failure to allege fraud with particularity, and 12(b)(6), for failure to state a claim
upon which relief can be granted, citing the Kansas statute of limitations, and claiming
McQueeney lacked standing because he was not the owner of the policy in dispute.[2]  Pursuant to
Fed. R. Civ. P. 15(a), plaintiffs filed a First Amended Complaint on May 28, 2009,[3] restating the
same three claims for relief and joining Sonset, L.P. as a necessary party plaintiff.  The Court
found the first motion to dismiss moot.[4]

This matter is now before the Court on defendant's Motion to Dismiss the First Amended

---

[1](Doc. 1.)

[2](Doc. 2.)

[3](Doc. 12.)

[4](Doc. 16.)

Complaint (Doc. 14). The motion has been fully briefed and the Court is prepared to rule. For the reasons explained below, defendant's motion to dismiss is granted.

I.  **Plaintiffs' First Amended Complaint**

The Court will consider plaintiffs' First Amended Complaint without regard for the original complaint.[5] Although defendant has attached a copy of each of the policies owned by or benefitting each of the plaintiffs, the Court declines to review them, but will address defendant's motion to dismiss based solely on the First Amended Complaint and documents attached to the First Amended Complaint by plaintiffs. "[A] motion to dismiss for failure to state a claim upon which relief can be granted must be converted into a motion for summary judgment whenever the district court considers matters outside the pleadings."[6] Although there are exceptions for defendants to submit "indisputably authentic" documents which the plaintiff does not incorporate by reference or attach, but to which plaintiff refers in the complaint and which are central to plaintiff's claims, the Court does not find it necessary to review the life insurance policies issued to each plaintiff in order to address plaintiffs' claims in light of defendant's motion to dismiss.[7]

The following facts are alleged in plaintiffs' First Amended Complaint, and the Court draws all reasonable inferences in favor of the plaintiffs. Plaintiff Douglas Guerin owns a Flexible Premium Multi-funded Life Insurance policy ("FPMLI") issued by defendant Met Life

---

[5]*See Mink v. Suthers*, 482 F.3d 1244, 1254 (10th Cir. 2007) ("An amended complaint 'supercedes an original complaint and renders the original complaint without legal effect[.]'" (quoting *In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000))).

[6]*Geer v. Cox*, 242 F. Supp. 2d 1009, 1015 (D. Kan. 2003) (citing Fed. R. Civ. P. 12(b)(6)).

[7]*See id.* at 1016.

in December 1991, insuring his mother Jeannine G. Guerin.  Plaintiff John McQueeney was a beneficiary under an FPMLI policy issued by defendant Met Life in May 1991, insuring his then-wife Debra McQueeney ("1991 Policy").  The 1991 Policy was cancelled in September 2001,[8] and Met Life issued a new policy to plaintiff Sonset, L.P., insuring Debra McQueeney ("2001 Policy").  McQueeney is a partner in Sonset L.P., and Sonset L.P. ("Sonset") is the owner of the 2001 Policy.[9]

Plaintiffs allege that the standard FPMLI policy sold by Met Life requires that a first year annual premium be paid by the owner.  Thereafter, insurance charges and fees are deducted from that first year annual premium.  Any excess is invested in insurance sub-account investments or fixed accounts by Met Life on behalf of the policyowner.  Additional insurance charges and fees for future years will be paid by earnings from the sub-account investments plus a "Guideline Annual Premium" ("GAP") that is paid by the policyowner.[10]

FPMLI policyowners were informed that so long as the sub-account investments were

---

[8]Plaintiffs' First Amended Complaint does not expressly allege the year Met Life issued Sonset's policy. The First Amended Complaint merely states that some time after 1998, "Met Life thereafter cancelled the [1991] Policy and issued a new policy in the name of Sonset."  (Doc. 12 ¶ 32.)  However, defendant argues, and plaintiffs concede in their Response, that Met Life issued Sonset's policy in 2001.  *See* Doc. 15 at 2; Doc. 17 at 7.

[9]Defendants attempt to dispute plaintiffs' allegations regarding who owned the 1991 and 2001 policies.  For the purposes of this motion to dismiss, the Court assumes plaintiffs' factual allegations are true.  *Ashcroft v. Iqbal*, – U.S. –, 129 S. Ct. 1937, 1949 (2009).  Met Life issued two policies insuring McQueeney's then-wife Debra McQueeney, one in 1991 and one in 2001.  Regardless of whether McQueeney helped to pay the premiums on the 1991 and 2001 policies, it appears from documents attached to plaintiffs' First Amended Complaint that Debra McQueeney owned the 1991 Policy, and plaintiff alleges that Sonset L.P. owned the 2001 Policy.  As a partner in Sonset L.P., McQueeney may have been acting as an agent for Sonset L.P. in obtaining the 2001 policy insuring Debra McQueeney.  However, this is not an issue the Court must decide in resolving defendant's motion to dismiss.

[10]In their First Amended Complaint, plaintiffs explain that the policy defines the GAP as "the level amount or premium that would be payable through Final Date of the Policy for the specified face amount of the policy if premiums were fixed by us as to both timing and amount and were based on the 1980 Commissioners Standard Ordinary Mortality Tables, net investment earnings of an annual effective rate of 5%, and fees and charges as set forth in the policy and any policy riders." (Doc. 12 ¶ 11.)

yielding five percent (5%) return per year, the owner of the policy would only be responsible for paying the First Year Premium and the ongoing GAP to keep the policy in effect. All excess dollars generated by the sub-account investments, if any, would continue to be reinvested in additional sub-account investments or fixed accounts to service the policy premiums, including the GAP, and would generate more dollars for the owners of the policies. All earnings from investments in sub-account mutual funds through these FPMLI policies would receive preferential tax treatment for the owners.

On March 17, 1994, Met Life issued letters to each of its FPMLI policyholders, informing them their policies had been "issued with an error on the Policy Specifications page" and enclosed new Policy Specifications pages to be inserted into their policies. Policyowners were instructed to call a toll free number if they had questions. The error involved a miscalculation by Met Life of the GAP to be paid by policyowners. This miscalculation caused the premium owed by policyowners to increase.

Plaintiffs allege that this increase in expense made it so that "many policy owners could no longer afford to pay the required premium, directly resulting in lapsed or surrendered policies or drastically reducing the sub-account investments in policies that remained in force." Furthermore, plaintiffs state that Met Life recognized its miscalculation would have a negative impact on policyowners' ability to fund their policies, and "Met Life intentionally omitted important information regarding the change in the policy specifications and instead, directed owners to call the toll-free number." Met Life provided its Customer Service Representatives with information to answer policyholders' questions about the error, but plaintiffs allege it "fail[ed] to account for how the new Annual Guideline Premiums will be paid by policyholders."

Plaintiffs allege that the March 17, 1994 letter and the internal communications to employees were "misle[ading]" and only "partial disclosures."

### A.    Plaintiff McQueeney

McQueeney purchased a policy on May 29, 1991 ("1991 Policy").  The owner of the policy was McQueeney's then-wife, Debra McQueeney.  McQueeney was the designated beneficiary.  The original policy was amended to allow for greater insurance coverage (from $500,000 to $2 million).  The initial GAP was $407.  The amended GAP was $4885.  Per Met Life's March 17, 1994 correspondence, the GAP was later raised to $49,631.79.[11]  McQueeney alleges he relied on Met Life's statements regarding preferential tax treatment for additional deposits to the 1991 Policy investment fund.  In 1998, McQueeney learned that additional deposits to the 1991 Policy resulted in the transformation of the policy into a modified endowment contract under the Internal Revenue Code, disqualifying tax-free access to the additional funds.

In 2001, Met Life cancelled the 1991 Policy and reissued a new policy in the name of Sonset on identical terms to the 1991 Policy.  McQueeney learned, however, that the guaranteed benefits of the 2001 Policy were not identical to the original 1991 Policy.  In March 2007, McQueeney first learned that the GAP to fund the 1991 and 2001 Policies was not the amount he initially agreed to pay.

### B.    Plaintiff Guerin

Plaintiff Guerin purchased a policy on December 9, 1991.  The policy insured Guerin's mother, Jeannine Guerin, and plaintiff Guerin owned the $100,000 life insurance policy.

---

[11]The Court notes that plaintiff pleads the above-listed number, but the specifications page indicates the cost as $49,639.71.  *See* Doc. 12, Attach. 6.

Initially, the First Year Premium was $2070.00, and the GAP was $172.50. Per Met Life's March 17, 1994 correspondence, the GAP was later raised to $3681.79.

Both plaintiffs allege they purchased their policies in reliance on Met Life's statements regarding the operation of the policies and the specific dollar amounts required to fund the policies, including the amount of the First Year Premiums and the GAP. Furthermore, plaintiffs claim they placed special confidence in Met Life to make prudent investment and management decisions, in the best interests of the policyowners, regarding the sub-account funds and how proceeds from the accounts were applied toward policy fees and costs. They claim the increase in GAP reduced the cash value of their policies and reduced the excess amount that could be invested in sub-accounts. Both plaintiffs state they have paid all costs and premiums each year as required by their policies to keep the policies in force. McQueeney has made regular payments since May 21, 1991, and Guerin has made regular payments since December 9, 1991.

### C.     McQueeney and Guerin's Claims

On February 5, 2009, plaintiffs filed the Complaint, and on May 28, 2009, plaintiffs' filed their First Amended Complaint, which is presently in dispute. In the First Amended Complaint, plaintiffs' allege three claims for relief. First, plaintiffs claim Met Life breached its fiduciary duty to them as policyholders. They allege Met Life possessed superior expertise with regard to the insurance policies and investments, and that, by unilaterally changing the GAP, failing to properly disclose the nature of the error and its effects, and directing Met Life employees to conceal the change, it breached its fiduciary duty. They allege the breach continued so long as Met life accepted payments of annual premiums beyond those to which they originally agreed.

6

Plaintiffs allege Met Life committed fraud by willfully and affirmatively concealing from plaintiffs McQueeney, Guerin, and Sonset the miscalculation of the Qualified Annual Premiums[12] and the consequences of the miscalculation, "with the intent to cause harm to them with respect to their FPMLI policies." Plaintiffs allege the mailing with the enclosed new Policy Specifications pages was "a non-descriptive mailing," "without any mention" of the increase in the GAP. They allege Met Life personnel were instructed not to inform FPMLI policyowners of the true consequences of the miscalculation, and instead, were instructed to make "partial and materially false disclosures." Met Life, furthermore, continued to accept premiums and insurance cost payments with knowledge the premiums were not the value which formed the basis of the original agreements with plaintiffs.

Finally, plaintiffs claim constructive fraud. They allege Met Life owed a duty to deal fairly with plaintiffs and make full disclosure of any changes to their policies. Met Life's unilateral change to the policies, resulting in exponential increases to the Qualified Annual Premiums,[13] subsequent failure to take appropriate action to inform plaintiffs of the consequences, and continued receipt of payments beyond the original policy amounts, had a "great tendency to deceive" plaintiffs.

For all three claims, plaintiffs allege they suffered "monetary damages from the reduction in the values of their FPMLI policies and pain and suffering and will continue to suffer such damages into the future."

---

[12]The Court notes that this is the first time plaintiffs have referred to a "Qualified Annual Premium." The Court assumes plaintiffs intend to reference the GAP discussed throughout the remainder of their First Amended Complaint.

[13]*See supra* note 12.

### D. Plaintiff Sonset L.P.

Although plaintiffs' First Amended Complaint did not include a separate section for Sonset L.P.'s claims, the facts surrounding Sonset's claims are unique from those presented by the other plaintiffs. The Court notes that McQueeney is a partner in Sonset,[14] and alleges to have made regular payments on Sonset's policy. In fact, the First Amended Complaint alleges facts specifically relating to Sonset's claims in Section IV, designated, "Factual Allegations Specific to McQueeney." Although Sonset's claims are unique, assuming as true the factual allegations in the First Amended Complaint, McQueeney acted on behalf of the partnership.

McQueeney alleges that in 2001,[15] Met Life cancelled the 1991 Policy insuring his then-wife Debra McQueeney, and reissued a new policy to Sonset L.P., insuring Debra McQueeney, "upon identical terms and conditions of the [1991] Policy."[16] Although he does not specify a date, McQueeney alleges that he "later learned . . . the guaranteed benefits of the [2001] Policy did not mirror those [in] the [1991] Policy."[17] Then, in March 2007, he "first learned" the GAP paid to fund the 1991 and 2001 Policies was not the amount he initially agreed to pay. Instead of a $4885 GAP, McQueeney was required to pay a $49,631.79 GAP. McQueeney alleges the increased GAP reduced the cash value of the 1991 and 2001 Policies and reduced the amount of excess dollars that should have been invested in additional sub-accounts per the provisions of the policy. From May 1991 until the present, McQueeney has continued to pay "all required

---

[14](Doc. 12 ¶ 5.)

[15]*See supra* note 8.

[16](Doc. 12 ¶ 32.)

[17](Doc. 12 ¶ 33.)

premiums and costs each year" as required by the 1991 and 2001 policies.[18]

Sonset alleges Met Life breached its fiduciary duty to Sonset by unilaterally changing the GAP in the FPMLI policy, failing to properly disclose the true nature of the claimed error and its effects, and by directing Met Life employees to conceal the change and the resulting consequences from McQueeney and Guerin.[19] Sonset alleges Met Life continued to breach its fiduciary duty by accepting, on an ongoing basis, payments of annual premiums that were not the basis of the original agreement for purchase of the 2001 Policy.

The majority of the facts alleged in support of the fraud claim relate to the 1994 Letter presented to McQueeney and Guerin.[20] Sonset, on the other hand, did not own its policy until 2001. Most of the facts alleged, therefore, are irrelevant to Sonset. The only fact relevant to Sonset's fraud claim is the allegation that Met Life accepted and retained premiums and insurance costs from the date of the issuance of the policy through the present date with knowledge the premiums were not the value which formed the basis of the original agreement for purchase.

Finally, Sonset alleges Met Life owed a duty to Sonset, as an FPMLI policyholder, to deal with it fairly and to make full disclosures regarding the policy and any changes to that policy. Met Life's unilateral change to the policy, resulting in increase to the GAP, and failure to take appropriate or prudent actions to inform Sonset of the consequences, had a great tendency

---

[18](Doc. 12 ¶ 36.)

[19](Doc. 12 ¶ 47.)

[20]In fact, plaintiffs did not attach a 1994 Letter addressed to Sonset, or a corrected Policy Specifications page for Sonset's policy. The documents plaintiffs attached to the First Amended Complaint all relate to Guerin's and McQueeney's claims. Thus, the Court finds the facts alleged in relation to Guerin's and McQueeney's claims are not directly related to Sonset's claims.

to deceive Sonset. Met Life's continued acceptance and retention of GAP payments created sustained efforts to deceive Sonset, and Sonset was deceived. As a result of all three claims, Sonset alleges it suffered monetary damages from the reduced value of its FPMLI policy and pain and suffering and will continue to suffer such damages into the future.

## II.    Legal Standards

### A.    Standards for Rule 12(b)(6)

In ruling on a Rule 12(b)(6) motion to dismiss, the court will draw all reasonable inferences in favor of the plaintiff.[21] Under Fed. R. Civ. P. 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint must give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.[22] To survive a motion to dismiss, a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face."[23]

The plausibility standard enunciated in *Bell Atl. Corp. v. Twombly* seeks a middle ground between heightened fact pleading and "allowing complaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' which the Court stated 'will not do.'"[24] The Supreme Court recently explained the analysis as a two-step process.

---

[21]*Dias v. City & County of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).

[22]*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The United States Supreme Court explained in *Bell Atlantic Corp. v. Twombly*: "Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." 550 U.S. 544, 555 n.3 (2007).

[23]*Twombly*, 550 U.S. at 555, 570.

[24]*Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555).

For the purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but] we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[25]  Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[26]  Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[27]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[28]

### B.       Standards for Rule 9(b)

Under Rule 9(b), a party claiming fraud "must state with particularity the circumstances constituting fraud or mistake."  The Court reads Rule 9(b) in conjunction with the principles of Rule 8, "which calls for pleadings to be simple concise and direct."[29]  "Rule 9(b)'s heightened pleading requirements serve to provide defendants adequate notice of the plaintiff's claim, to protect defendants from reputational damage caused by 'improvident charges of wrongdoing,' and to 'inhibit the institution of strike suits.'"[30]  To survive a motion to dismiss, an allegation of fraud must "set forth the time, place, and contents of the false representation, the identity of the

---

[25]*Ashcroft v. Iqbal*, – U.S. –, 129 S. Ct. 1937, 1949–50 (2009).

[26]*Id.* at 1950.

[27]*Id.*

[28]*Id.* at 1949.

[29]*Jamieson v. Vatterott Educ. Ctr., Inc.*, 473 F. Supp. 2d 1153, 1156 (D. Kan. 2007) (quoting *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997)).

[30]*Plastic Packaging Corp. v. Sun Chem. Corp.*, 136 F. Supp. 2d 1201, 1203 (D. Kan. 2001) (quoting *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986 (10th Cir. 1992)).

party making the false statements and the consequences thereof."[31]  In other words, plaintiff must set out the "who, what, where, and when" of the alleged fraud.[32]

## III.  Analysis

Defendant argues in its motion to dismiss: (1) plaintiffs' claims are barred by the applicable statute of limitation, (2) plaintiffs fail to plead fraud with particularity under Rule 9(b), and (3) plaintiffs fail to state a claim for relief under Rule 12(b)(6) due to insufficient pleading.  The Court begins its analysis with the statute of limitations.

### A.    *Statute of Limitations*

"The statute of limitations is an affirmative defense, but if the dates given in the complaint make clear that the right sued upon has been extinguished, plaintiff has the burden of establishing a factual basis for tolling the statute of limitations."[33]  A statute of limitations question, therefore, may be resolved through a Rule 12(b) motion.[34]  A claim is properly dismissed when an "issue of law is dispositive."[35]  Therefore, if the statute of limitations is determinative as a matter of law, the Court need not address defendant's other arguments for dismissal.

### 1.    Accrual of Claims

---

[31]*Schwartz*, 124 F.3d at 1252 (quoting *Lawrence Nat'l Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176, 180 (10th Cir. 1991)).

[32]*Jamieson*, 473 F. Supp. 2d at 1156 (quoting *Plastic Packaging Corp.*, 136 F. Supp. 2d at 1203).

[33]*Ware v. Union Pacific R.R. Co. Omaha*, 278 F. Supp. 2d 1263, 1265 (D. Kan. 2003) (citing *Aldrich v. McCulloch Prop., Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980)).

[34]*Id.* (citing *Aldrich*, 627 F.2d at 1041 n.4; 5 Wright & Miller, Federal Practice & Procedure § 1357, at 606–08 (1969)).

[35]*Plastic Packaging Corp.*, 136 F. Supp. 2d at 1204.

"[A] federal court exercising diversity jurisdiction applies the statute of limitations of the forum state, even when the action is brought under the law of another state."[36] Furthermore, a federal court will apply the state's tolling rules.[37] Thus, regardless of what substantive law governs plaintiffs' claims, Kansas law provides the statute of limitations. Under K.S.A. § 60-513(a), Kansas provides a two-year statute of limitations for fraud and tort claims, including plaintiffs' claims for breach of fiduciary duty, fraud, and constructive fraud.[38]

Under Kansas law, the two-year statute of limitations begins to run on a fraud claim when "the fraud is discovered."[39] "Fraud is discovered at the time of actual discovery, or when, with reasonable diligence, the fraud could have been discovered."[40] "Discovery" means "the discovery by the person defrauded of such facts indicating he had been defrauded as would cause a reasonably prudent person to investigate, and which, if investigated with reasonable diligence, would lead to knowledge of the fraud."[41]

Generally, for all claims under § 60-513(a), the two-year statute of limitations begins to

---

[36]*Hutton v. Deutsche Bank AG*, 541 F. Supp. 2d 1166, 1169 (D. Kan. 2008) (citing *Dow Chem. Corp. v. Weevil-Cide Co.*, 897 F.2d 481, 483–84 (10th Cir. 1990); *see also Bagby v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 104 F. Supp. 2d 1294, 1297 (D. Kan. 2000)).

[37]*State Farm Mut. Auto. Ins. Co. v. Boellstorff*, 540 F.3d 1223, 1228 (10th Cir. 2008); *Cook v. G.D. Searle & Co.*, 759 F.2d 800, 802–03 & n.4 (10th Cir. 1985).

[38]K.S.A. § 60-513(a)(3)-(4); *Hutton*, 541 F. Supp. 2d at 1171; *Bagby*, 104 F. Supp. 2d at 1298–99 (applying two year statute of limitations to breach of fiduciary duty and fraud).

[39]K.S.A. § 60-513(a)(3).

[40]*Bagby*, 104 F. Supp. 2d at 1299 (citing *Augusta Bank & Trust v. Broomfield*, 643 P.2d 100, 108 (Kan. 1982)).

[41]*Rajala v. Allied Corp.*, 919 F.2d 610, 625 (10th Cir. 1990) (quoting *Wolf v. Brungardt*, 524 P.2d 726, 734 (Kan. 1974)). Some courts have distinguished between the "reasonable diligence" standard applied to fraud claims under K.S.A. § 60-513(a)(3) and the general rule of K.S.A. § 60-513(b), which applies a "reasonably ascertainable" standard. *Compare Hutton v. Deutsche Bank AG*, 541 F. Supp. 2d 1166, 1169–70 (D. Kan. 2008), *with Rajala*, 919 F.2d at 625–26. *But see Schrag v. Dinges*, 788 F. Supp. 1543, 1549 (D. Kan. 1992). Although the Court recognizes there may be a slight distinction, under the facts of this case, it does not affect the Court's analysis or outcome.

run when the claim accrues, that is, when "the act giving rise to the cause of action first causes substantial injury, or . . . [when] the fact of injury becomes reasonably ascertainable to the injured party . . . ."[42]  A plaintiff need not have "actual knowledge" of an injury for his claim to accrue.[43]  Rather a plaintiff need only "have such notice as would permit him to discover the injury with the use of due diligence."[44]  In determining the date upon which an injury is "reasonab[ly] ascertainable," the court must "invoke an objective standard based on an examination of all the surrounding circumstances."[45]  Whether plaintiff exercised due diligence in discovering his claims may be a question for the court.[46]  Because the facts presented by plaintiffs McQueeney and Guerin are distinct, the Court addresses their claims first, and will separately analyze claims presented by plaintiff Sonset, which did not purchase an FPMLI policy from Met Life until 2001.

### a.      McQueeney and Guerin's Claims

All three of Guerin and McQueeney's claims arise out of the same set of facts and are subject to the same statute of limitations, therefore, the Court will address Guerin and McQueeney's claims for fraud, constructive fraud, and breach of fiduciary duty collectively. McQueeney and Guerin allege that defendant Met Life committed fraud, constructive fraud, and

---

[42]K.S.A. § 60-513(b).

[43]*Hutton*, 541 F. Supp. 2d at 1170 (quoting *Austin v. U.S. Bank, Nat'l Ass'n*, No. 03-4130, 2006 WL 980739, at *11 (D. Kan. Jan. 25, 2006)).

[44]*Id.* (quoting *Austin*, 2006 WL 980739, at *11).

[45]*Id.* (quoting *Rigby v. Clinical Reference Lab., Inc.*, 995 F. Supp. 1217, 1222 (D. Kan. 1998)).

[46]*Schrag v. Dinges*, 788 F. Supp. 1543, 1550 (D. Kan. 1992) (citing *Ohio v. Peterson, Lowry, Rall, Barber & Ross*, 651 F.2d 687, 694 (10th Cir.), *cert. denied*, 454 U.S. 895, 102 S. Ct. 392 (1981)).  "Any rule which makes the statute of limitations necessarily a jury question defeats the statute's purpose of preventing trials of stale claims." *Ohio*, 651 F.2d at 694.

breached its fiduciary duty to plaintiffs when it unilaterally changed plaintiffs' life insurance policy premiums, notified plaintiffs of an error in their policies via a "non-descriptive" March 1994 letter ("1994 Letter") in which it provided the new policy language, instructed policyholders to direct all questions to Met Life service representatives, and thereafter, collected and retained the increased premium payments submitted by plaintiffs.

Met Life argues that its 1994 Letter provided McQueeney and Guerin with an Updated Policy Specifications page, expressly listing the increased GAP owed by policyholders. Furthermore, the letter informed policyholders they could direct questions to service representatives. In plaintiffs' First Amended Complaint, plaintiffs neither claim to have read the policy specifications page included in the 1994 correction letter, nor to have called any service representatives for additional information. Rather, Plaintiffs plead that they voluntarily paid the increased annual premiums, including the GAP, every year for fourteen years after the annual amount had been changed, from the date of Met Life's 1994 Letter until the date of the current lawsuit.[47] The opportunity to investigate the changes to the policy, and pursue any claims with "due diligence" arose either when plaintiffs received the 1994 Letter, or, at the latest, when their premiums became due at an "exponentially" higher amount.

McQueeney alleges he "first learned" that Met Life had changed the GAP in March of

_____

[47]See Doc. 12 ¶¶ 10, 36, 43. Although the First Amended Complaint is not clear as to how much a policyholder paid annually, and how that amount was measured, it states that the policyholder was responsible for paying the GAP. ¶ 10. Plaintiffs allege the increase to the GAP made it so that "many policy owners could no longer afford to pay the required premium." ¶ 20. They also allege that Service Representatives, in speaking with policyholders about the 1994 error, "fail[ed] to account for how the new Annual Guideline Premiums w[ould] be paid by policyholders of in force policies." ¶ 23. Finally, plaintiffs state that, after the 1994 Letter, Met Life began "accepting payments of annual premiums" beyond what the parties originally agreed. ¶ 48. Assuming these facts to be true, after the 1994 Letter, policyholders were paying much higher premiums on an annual and ongoing basis, so that the consequences of the change in GAP were felt by all policyholders, whether they surrendered their policies as a consequence or continued making the payments at an increased level.

2007.  He does not, however, explain the source of his knowledge.  Regardless of what factors

alerted him to the change, under Kansas law "actual knowledge" is not the requisite standard for

determining when a claim accrues.[48]  Rather, the Court applies an "objective standard . . . based

on all the surrounding circumstances"[49] to determine when a plaintiff had sufficient facts to

warrant a more thorough investigation.[50]  Guerin and McQueeney had sufficient information in

1994 which, "if investigated with reasonable diligence, would [have led] to knowledge" of the

fraud, constructive fraud, and breach of fiduciary duty they are presently claiming.[51]  Instead,

plaintiffs waited fourteen years to bring their claims, filing suit for the first time in February

2009.  The two-year statute of limitations bars such stale claims as those presented under the

1991 Guerin Policy and Debra McQueeney's 1991 Policy, regardless of their validity.

      Furthermore, the Kansas statute of repose terminates claims after ten years from the act

that gave rise to the claims, whether or not the claims even began to accrue.[52]  K.S.A. § 60-

513(b) provides that "*in no event* shall an action be commenced more than 10 years beyond the

time of the act giving rise to the cause of action."[53]  Thus, even if the statute of limitations were

tolled, it could not be tolled beyond ten years after the act giving rise to the action.  The Kansas

---

[48]*Hutton*, 541 F. Supp. 2d at 1170 (citing *Rigby*, 995 F. Supp. at 1222).

[49]*Id.* (quoting *Rigby*, 995 F. Supp. at 1222).

[50]*Bagby v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 104 F. Supp. 2d 1294, 1300 (D. Kan. 2000).

[51]*See Rajala v. Allied Corp.*, 919 F.2d 610, 628 (10th Cir. 1990) (quoting *Wolf v. Brungardt*, 524 P.2d 726, 734 (Kan. 1974)) (noting that plaintiff's failure to detect the fraud was *not* because defendant "made affirmative misrepresentations such that the plaintiff had no independent reason to make further inquiries," which might justify tolling the statute of limitations).

[52]*Morrison v. Watkins*, 889 P.2d 140, 149 (Kan. Ct. App. 1995) ("Statutes of repose are generally substantive and abolish a cause of action after a specific time period, even if the cause of action may not have accrued yet.") (citing *Harding v. K.C. Wall Prods., Inc.*, 831 P.2d 958, 967–68 (Kan. 1992)).

[53]K.S.A. § 60-513(b) (emphasis added); *see Morrison*, 889 P.2d at 149.

Supreme Court has stated that "statutes of repose 'generally lack tolling provisions.'"[54]

Therefore, even if plaintiffs McQueeney and Guerin are correct in applying the "continuous representation rule" to their claim for breach of fiduciary duty,[55] the claim, like their claims for fraud and constructive fraud, are ultimately barred by Kansas's statute of repose and appropriately dismissed. At this point, the Court declines to analyze the sufficiency of McQueeney's and Guerin's pleading, as any analysis would be superfluous in light of the statute of repose.

### b. Sonset's Claims

Sonset alleges it purchased a policy from Met Life in 2001 and later discovered it did not mirror the 1991 Policy. McQueeney claims he paid the annual premiums and costs "each year as required by the [1991] and [2001] Policies" to keep the policies in force "[s]ince May 21, 1991."[56] McQueeney also alleges that, in March 2007, he first discovered that the GAP to fund the 1991 and 2001 Policies was $49,639.71 instead of $4885.[57]

Regardless of whether McQueeney read Sonset's 2001 Policy or relied on representations made to him about its terms and conditions (facts which were not alleged or discussed in the First Amended Complaint), the Court notes that McQueeney made regular payments on the 1991 Policy and continued to make regular payments on the 2001 Policy. If the regular payments on the 2001 Policy were higher than plaintiff expected, and substantially greater than the 1991

---

[54]*Morrison*, 889 P.2d at 149 (citing *Harding*, 831 P.2d at 964).

[55]The "continuous representation rule" is discussed more fully in Section III.A.2, *infra*, with regard to Sonset's claims.

[56](Doc. 12 ¶ 36.)

[57](Doc. 12 ¶ 34.)

Policy, as he alleges, it would have given him sufficient notice that the 2001 Policy was not "identical" to the 1991 Policy. In fact, any consistency between the post-1994 Policy and the 2001 Policy, would have alerted McQueeney that the 2001 Policy was not identical to the 1991 Policy *before* the 1994 changes. The Court finds, therefore, that the claim began to accrue when the first annual payments became due on the 2001 Policy. Because Sonset's policy was issued in 2001, the claims began to accrue when annual payments became due. Yet, Sonset did not file suit until 2009. The Court finds that the two-year statute of limitations has already run on Sonset's claims for breach of fiduciary duty, fraud, and constructive fraud.

### 2. Tolling Doctrines

Plaintiffs asks this Court to toll the statute of limitations. Generally, the statute of limitations is not tolled "until the plaintiff can appear in court with knowledge of every detail and show the exact method by which the defendant perpetrated the fraud. Rather, the threshold is lower – the statute begins to run when the plaintiff has such information that a more thorough investigation is warranted."[58] Out of an abundance of caution, the Court will consider the equitable doctrines proposed by plaintiffs that might permit tolling of the statute of limitations in this case.

Plaintiffs claim they have made repeated and successive premium payments, and defendant's decision to retain those payments constituted a "continuous breach" of Met Life's duty to plaintiffs, tolling the statute of limitations. Plaintiffs cite *Paul Holt Drilling, Inc. v. Liberty Mutual Insurance Co.*[59] in support of their claim that defendant's repeated conduct tolls

---

[58]*Bagby v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 104 F. Supp. 2d 1294, 1300 (D. Kan. 2000).

[59]664 F.2d 252 (10th Cir. 1981).

the statute of limitations. The Court finds this case irrelevant to the present facts. *Paul Holt* addresses an insurance company's contractual duty to defend its insured, after the insured repeatedly requested the company provide a defense, and the company repeatedly refused.[60] In the present case, however, plaintiffs have not raised a contract claim, nor alleged that they made repeated requests of their insurance company to provide a particular service under its contract. Rather, Met Life informed plaintiffs of a change in plaintiffs' insurance policies, and plaintiffs subsequently and repeatedly paid the increased amount voluntarily, without investigation.[61] Thus, the "continuing wrong" doctrine is inapplicable to these facts.

Next, plaintiffs cite *Morrison v. Watkins*[62] to support their claim that the Court should apply the "continuous representation rule" to "fix the time when the accrual of a cause of action occurs and the statute of limitations begins to run."[63] However, this rule is "generally applied to attorney malpractice" claims, whereby "the client's cause of action does not accrue until the attorney-client relationship is terminated."[64] The rationale behind the rule is as follows:

> [It] permit[s] an attorney to continue his efforts to remedy a bad result, even if some damages have occurred and even if the client is fully aware of the attorney's error. The doctrine is fair to all parties concerned. The attorney has the opportunity to remedy, avoid or establish that there was no error or attempt to mitigate the damages. The client is not forced to terminate this relationship,

---

[60]*Id.* at 256.

[61]Plaintiffs admit to having made repeated payments above the original amount agreed to in their original policies. Thus, they were making regular payments on the basis of a new figure. The Court has found such payments constitute sufficient notice for plaintiffs' claims to accrue.

[62]889 P.2d 140 (Kan. Ct. App. 1995).

[63]*Id.* at 146.

[64]*Id.*

although the option exists.[65]

The Court knows of no other context in which Kansas courts have applied this rule.[66]

This Court declines to extend the rule to an insurer-insured relationship. Kansas courts have held that an insurance contract, without more, does not create a fiduciary relationship between the carrier and the policyholder.[67] Although McQueeney alleges Met Life was not just an insurer, but also an investor for the benefit of its insured, he has failed to allege facts showing or even alleging that Met Life mismanaged investments. The Court declines to extend the "continuing representation rule" to a case in which McQueeney received express notice in 1994 that the insurer had made an error, but never claims to have reviewed the policy he received, never spoke with an insurance agent about the alleged error, and never clarified any concern he had regarding the increased premium payments that were subsequently due. Sonset, furthermore, owned its policy in 2001, but McQueeney continued to make regular payments on it without question or inquiry. Both plaintiffs waited eight years to file this lawsuit. Such facts do not warrant application of the "continuing representation" tolling rule.

## B.    Fraud Claims Alleged By Sonset

In the alternative, defendant argues that Sonset has failed to state claims for relief under

---

[65]*Id.* (quoting *Pittman v. McDowell, Rice & Smith, Chtd.*, 752 P.2d 711, 715–16 (Kan. Ct. App. 1988) (quoting Mallen and Levit, Legal Malpractice § 391, pp. 460-61 (2d ed. 1981))).

[66]*Id.* at 148 ("Kansas has so far only recognized the continuous representation rule in legal malpractice actions.").

[67]*Gottstein v. Nat'l Ass'n for Self Employed*, 53 F. Supp. 2d 1212, 1221 n.2 (D. Kan. 1999) ("An insurance contract alone is insufficient to create a fiduciary relationship between the carrier and the policyholder with respect to first party claims. . . . In fact, the Kansas Supreme Court has noted that an adversary relationship exists in such circumstances.") (citing *Spencer v. Aetna Life & Cas. Ins. Co.*, 611 P.2d 149, 155 (Kan. 1980); *Young v. State Farm Mut. Auto. Ins. Co.*, 951 F.2d 1262, 1992 WL 1690, at *6 (10th Cir. Jan. 3, 1992)).

Rule 9(b).  Rule 9(b) applies to Sonset's claims for fraud and constructive fraud.[68]  Although

Sonset attempts to raise new facts in support of its claims in the Response to Defendant's Motion

to Dismiss (Doc. 17), and Met Life attempts to dispute those facts in its Reply (Doc. 18), the

Court looks only at the facts alleged in plaintiffs' First Amended Complaint and those facts to

which the parties agree in their briefs.

Sonset does not allege (1) *who* committed fraud when Sonset purchased the 2001 FPMLI

policy, (2) *what* fraudulent statements or representations were made, (3) *where* those statements

were made, or (4) *when* Sonset was led to believe the 2001 Policy was "identical" to the 1991

Policy.  Based on the allegations in the First Amended Complaint, it is unclear to the Court that

any fraud occurred.  Plaintiff's pleading includes no express statements made by anyone to

Sonset regarding Sonset's policy.  The pleading simply states that Met Life "cancelled the

[1991] Policy and reissued a new policy in the name of Sonset upon identical terms and

conditions of the [1991] Policy,"[69] which plaintiff "later learned" did not include the "guaranteed

benefits of the [1991] Policy."[70]  If Sonset's 2001 Policy was issued on terms consistent with the

1991 Policy *after* the 1994 changes, it is unclear that any fraud occurred at all.  Furthermore,

most of the facts alleged in the fraud count (paragraphs 50-52) relate to the 1994 Letter issued by

Met Life before Sonset applied for an FPMLI policy in 2001.  If Sonset was, indeed, unclear as

to the terms of its FPMLI policy in 2001, it has not alleged facts sufficient to show that its

---

[68]The Court notes that, under the Kansas Rules of Civil Procedure, the Kansas Supreme Court has been reluctant to apply heightened pleading standards to claims for constructive fraud.  *See Nelson v. Nelson*, 205 P.3d 715, 726 (Kan. 2009).  However, the District Court of Kansas has previously applied Fed. R. Civ. P. 9(b) to claims for "constructive trust."  *See Geer v. Cox*, 242 F. Supp. 2d 1009, 1023–24 (D. Kan. 2003).  This Court, likewise, finds it appropriate to apply heightened pleading standards to all claims for fraud, actual and constructive.

[69](Doc. 12 ¶ 32.)

[70](Doc. 12 ¶ 33.)

confusion was a result of a particular act of fraud by a particular representative of Met Life. Therefore, the Court finds that Sonset's claim for fraud should be dismissed for failure to meet the heightened pleading standard of Fed. R. Civ. P. 9(b).

Under Kansas law,[71] a claim for constructive fraud is defined as "a breach of a legal or equitable duty which . . . the law declares fraudulent because of its tendency to deceive others or violate a confidence, and neither actual dishonesty [n]or purpose or intent to deceive is necessary."[72] In addition, plaintiff must show "(1) a confidential relationship, and (2) a betrayal of this confidence or a breach of a duty imposed by the relationship."[73] "The party must also conceal facts that the party has a legal or equitable duty to communicate, with respect to which the party could not be innocently silent."[74]

Although a fiduciary relationship is often analyzed under the normal pleading standards of Rule 12(b)(6), the District Court of Kansas has applied the heightened pleading standards of Rule 9(b) to claims for constructive fraud.[75] Assuming that there was a confidential relationship between Sonset and Met Life, the Court finds that Sonset does not specify what facts were concealed that Met Life had a duty to disclose. Rather, it is unclear from the First Amended Complaint what misunderstanding took place between Sonset and Met Life, whether Sonset's 2001 Policy was issued upon assurances that it "mirrored" the 1991 Policy *before* the 1994

---

[71]Neither plaintiffs nor defendant dispute that Kansas law applies. Therefore, consistent with the parties' briefs, the Court applies Kansas law to each claim.

[72]*Nelson*, 205 P.3d at 726 (quoting *Schuck v. Rural Tel. Serv. Co.*, 180 P.3d 571, 577 (Kan. 2008)).

[73]*Id.* (quoting *Schuck*, 180 P.3d at 577).

[74]*Schuck*, 180 P.3d at 577 (citing *Moore v. State Bank of Burden*, 729 P.2d 1205, 1212 (Kan. 1986), *cert. denied*, 482 U.S. 906 (1987)).

[75]*See Geer v. Cox*, 242 F. Supp. 2d 1009, 1023–24 (D. Kan. 2003).

changes or upon assurances that it "mirrored" the 1991 Policy *after* the 1994 changes. In fact, Sonset does not even claim "assurances" were made. Assuming a confidential relationship existed, Sonset has failed to plead any particular fraud or concealment, actual or constructive. Sonset's claims for fraud and constructive fraud, therefore, should be dismissed under Rule 9(b).

### C. Breach of Fiduciary Duty Claim Alleged by Sonset

Finally, defendant alleges that Sonset's claim for breach of fiduciary duty should be dismissed for failure to state a claim under Rule 12(b)(6). Under Kansas law, there are two types of fiduciary relationships: "(1) those specifically created by contract such as principal and agent . . . and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions."[76] A fiduciary relationship "refers to any relationship of blood, business, friendship, or association in which one of the parties reposes special trust and confidence in the other who is in a position to have and exercise influence over the first party."[77] The fiduciary "has the duty to act in good faith and with due regard to the interests of the party placing confidence in the fiduciary."[78]

The Kansas Supreme Court identified the following factors as relevant to the creation of a fiduciary relationship implied in law: (1) a special confidence is placed by one entity in another; (2) a duty to act primarily for another's benefit; (3) a party possessing and exercising influence over another; (4) superiority of one party over the other; and (5) the property, interest,

---

[76]*Wilson v. Wilson*, 154 P.3d 1136, 1146 (Kan. Ct. App. 2007) (citing *Denison State Bank v. Madeira*, 640 P.2d 1235, 1241 (Kan. 1982)).

[77]*Estate of Draper v. Bank of Am., N.A.*, 205 P.3d 698, 707 (Kan. 2009) (citing *Heck v. Archer*, 927 P.2d 495, 500 (Kan. Ct. App. 1996)).

[78]*In re Conservatorship of Huerta*, 41 P.3d 814, 821 (Kan. 2002) (quoting *Hawkinson v. Bennett*, 962 P.2d 445, Syl. ¶ 4 (Kan. 1998)).

or authority of the other is placed in the charge of the fiduciary.[79]  Kansas courts have also considered weakness in "business intelligence, knowledge of the facts involved or other conditions giving to one an advantage over the other."[80]  The Kansas Supreme Court, however, has been reluctant to "convert ordinary day-to-day business transactions into fiduciary relationships where none were intended or anticipated."[81]  "[O]ne may not abandon all caution and responsibility for his own protection and unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary."[82]  Therefore, "the burden of proving such a relationship existed rests upon the party asserting its existence."[83]

This Court finds the facts alleged in the relevant portion of plaintiff's First Amended Complaint (paragraphs 44 through 49) are insufficient to state a claim for breach of fiduciary duty.  To survive a Rule 12(b)(6) motion to dismiss, plaintiff's claim must contain "enough facts to state a claim to relief that is plausible on its face."[84]  "[A] formulaic recitation of the elements

---

[79]*See Denison State Bank*, 640 P.2d at 1241.

[80]*First Bank of Wakeeney v. Moden*, 681 P.2d 11, 13 (Kan. 1984).

[81]*Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1361 (D. Kan. 1996) (quoting *Denison State Bank*, 640 P.2d at 1243) ("[T]his more protective approach will ordinarily not be utilized as between two or more business people or business entities who each possess the capacity to protect themselves" (citing *Ritchie Enters. v. Honeywell Bull, Inc.*, 730 F. Supp. 1041, 1054 (D. Kan. 1990)).

[82]*Denison State Bank*, 640 P.2d at 1243-44.  The Tenth Circuit has even held that "'conscious assumption of the alleged fiduciary duty is a mandatory element under Kansas Law.'"  *Arst v. Stifel, Nicolaus & Co., Inc.*, 86 F.3d 973, 980 (10th Cir. 1996) (quoting *Rajala v. Allied Corp.*, 919 F.2d 610, 615 (10th Cir. 1990)).

[83]*Nelson v. Nelson*, 162 P.3d 43, 53 (Kan. Ct. App. 2007) (citing *Kampschroeder v. Kampschroeder*, 887 P.2d 1152, 1156 (Kan. Ct. App. 1995)).

[84]*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

of a cause of action will not do."[85]  In Count I, Sonset alleges it placed "special confidence" in Met Life"; Met Life "possessed superior expertise with regards to the insurance policies and investments creating unequal positions between [plaintiffs] and Met Life"; and Met Life "breached its fiduciary duty."  Sonset's allegations are largely legal conclusions, not warranting the assumption of truth.  From the facts alleged, it appears that Sonset and Met Life were engaged in a business relationship and Met Life had superior knowledge of the FPMLI policy, but Sonset has not alleged sufficient facts to show that Met Life consciously assumed a fiduciary relationship or that Met Life withheld from Sonset information regarding the 2001 Policy. References to a "claimed error" in the policy, failure to properly disclose the error, and employee efforts to "conceal the change" all appear to relate to the 1994 Letter, which are not relevant to Sonset's claims.  The Court has previously noted that "[a]n insurance contract alone is insufficient to create a fiduciary relationship between the carrier and the policyholder with respect to first party claims."[86]

Even assuming Sonset had a fiduciary relationship with Met Life, Sonset has not pled any facts relating to Met Life that show a specific breach of duty.  Sonset does not allege any specific communications between Met Life and Sonset, or any attempt by Met Life to withhold policy information, such as might demonstrate a breach of duty.  Sonset was apparently unclear as to the terms of its FPMLI policy, however, Sonset has not alleged facts showing that its confusion was the result of Met Life's breach of duty.  Because Sonset has failed to do so,

---

[85]*Id.* at 555.

[86]*Gottstein v. Nat'l Ass'n for Self Employed*, 53 F. Supp. 2d 1212, 1221 n.2 (D. Kan. 1999) (citing *Spencer v. Aetna Life & Cas. Ins. Co.*, 611 P.2d 149, 155 (Kan. 1980); *Young v. State Farm Mut. Auto. Ins. Co.*, 951 F.2d 1262, 1992 WL 1690, at *6 (10th Cir. Jan. 3, 1992)).

Sonset's claim for breach of fiduciary duty is properly dismissed under Rule 12(b)(6).

## IV.     Conclusion

McQueeney and Guerin concede that the act giving rise to their causes of action occurred in 1994 when Met Life unilaterally changed their FPMLI insurance policies and distributed letters notifying policy owners than an error had been made.  The 1994 Letter enclosed an Updated Policy Specifications page, which expressly listed the change to the GAP.  Furthermore, both plaintiffs state they have paid their premiums every year since they received Met Life's 1994 Letter.  Thus, the act giving rise to the cause of action accrued more than fourteen years prior to plaintiffs bringing this lawsuit in February of 2009.  Under the Kansas statute of repose, plaintiffs' claims for breach of fiduciary duty, fraud, and constructive fraud are barred.  Sonset's claims are similarly barred by the two-year statute of limitations provided in K.S.A. § 60-513(a), as Sonset filed its claims eight years after the claims began to accrue.  Additionally, Sonset's pleadings fail to satisfy Rule 9(b) or Rule 12(b)(6).  For the foregoing reasons, plaintiffs' claims are all dismissed.

**IT IS THEREFORE ORDERED** that defendant's Motion to Dismiss the First Amended Complaint (Doc. 14) is **granted.**

**IT IS SO ORDERED.**

Dated:  October 29, 2009

 S/ Julie A. Robinson_____
 JULIE A. ROBINSON
 UNITED STATES DISTRICT JUDGE